Council. My name is Michael Filipovich. I represent Mr. Henry Redlightning. With me at council table is Christopher Kerkering, co-counsel on this case. This is an appeal from a murder conviction which was based almost solely on the confessions of Mr. Redlightning. Each issue we raise in our brief relates in some fashion or another to that confession. The I'd like to start with the Fourth Amendment issue we raise in our brief. In a line of cases from the U.S. Supreme Court, beginning with Brown v. Illinois 35 years ago, the Supreme Court established the principle that the police, law enforcement, cannot pick a person up from their home without probable cause, deliver them to the station house, and interrogate that individual while that individual reasonably believes they're actually being detained by the police. Five years later, in the case of Dunaway v. New York, the issue again presented itself to the Supreme Court. There were two issues presented. One of the issues that was presented in Dunaway v. New York was whether Mr. Dunaway was in fact in custody, or rather detained for Fourth Amendment purposes when he was taken to the station. That was presented in the briefs of both the parties. It was one of the issues before the court. The facts of Dunaway, I would suggest to the court, are very close to the facts of this case. Dunaway was picked up by the police at a neighbor's house. He was taken in a police car. He was not handcuffed. He was not touched in any way. He was not questioned on the way to the police station. At the police station, he was given his Miranda rights, and he was interrogated about the crime of what was a murder of a pizza shop owner in that case. Under those facts, the court found, the U.S. Supreme Court in Dunaway found and held that Mr. Dunaway was effectively detained for Fourth Amendment purposes in a manner really indistinguishable from an arrest given the circumstances in which he was transported. Some of the facts I've referred to just now are found also in the New York State Court of Appeals opinion. That was the decision directly below the U.S. Supreme Court opinion. The only distinguishing fact in Dunaway from our case is that in Dunaway, the detectives actually testified that had Dunaway said, listen, I'm going to leave, they would not have allowed him to leave. That fact, however, in terms of its legal significance, is insignificant when we look at subsequent Supreme Court cases on this topic, particularly the case of the United States v. Mendenhall in footnote six. The court says the intent of the agents at the unexpressed intent of the agents of the police is not relevant. And the way the cases have all looked at this subsequent to Dunaway, they've looked at the objective factors, Florida v. Royer, Mendenhall, and then most recently from the U.S. Supreme Court in a case called Kopp v. Texas, a case with far more egregious facts than either this detention decision in Dunaway based on the objective facts as a holding. They refer to it as a holding in Kopp. So we would suggest to the court that our facts in terms of what happened to Mr. Red Lightning and what a reasonable person would believe are in fact more egregious than what happened to Mr. Dunaway. And I'd like to review some of those with you. First, after, when the agents went to his house, and I think we have to put this in context, one thing that makes this, I suggest, worse than many other cases is this was a calculated plan by these two agents. We had a very experienced case agent. We had an agent, Agent Lauer, who was an interrogation polygraph specialist for the FBI. He teaches law enforcement personnel and FBI agents how to do polygraphs, how to conduct interrogations. This agent is well-schooled, well-trained. He understood the law going into this event. They testified candidly that they wanted to get Mr. Red Lightning out of his comfort zone. And at one point, one of the agents testified that when asked, well, you didn't tell him that he was not under arrest, that he was free to leave, and that he could just go at any time, the agent said, well, we certainly didn't want to talk him out of it. Now, when they first got him into the car, when they first came to his house, they did not tell him, they did not tell Mr. Red Lightning that he was a suspect in a murder. They did not tell him when he would be coming back. They knew many things about Mr. Red Lightning before this interrogation session. They knew, because they had his VA records, that he was a Vietnam vet, that he suffered from post-traumatic stress disorder. He had been hospitalized for post-traumatic stress disorder. They knew from interviewing his stepdaughter that he had serious problems with his vision. They knew both of those facts before they picked him up. They knew he suffered from diabetes, and he was insulin-dependent diabetic for many, many years. On the way to the patrol car, the district court made one finding. The district court said when he left the house, when Red Lightning agreed to leave the house, that was voluntary. That may be true. At that slice in time, that may have been a voluntary act by Mr. Red Lightning, given the lack of information he was provided. But everything that happened after that changed this encounter from a voluntary encounter to a situation where a reasonable person would feel they had no control. The first thing that happens on the way to the car, they pat him down for weapons. Now the agent says, I just did a light pat with the back of my hands. If police come to your house and say, we think maybe you're a witness, could you come down to the station and help us out? You get out of your living room, you walk to the car, and all of a sudden they're patting you down. What are you thinking? What does a reasonable person think? Something's not quite right here. Why are they doing this to me? But it doesn't end there. After they drive him the 1.6 miles, they get him to the office. They have to go up to the third floor. They walk down the hall. There's an office. They have to unlock the doors. They put him into an office. It was actually Agent Power's office. It had been prepared. They called it cleansed for an interrogation. It was prepared to be an interrogation room. There was one window. It was covered by a map. Everything was taken off of the walls. A polygraph machine was sitting on the desk. And what do they do at that point? Two agents put him in that room. They read him as Miranda Writes. Now the fact of reading the Miranda Writes may not by itself under the case law mean that you're in custody or you're being detained for Fourth Amendment purposes, but it is a factor for the court to consider. A reasonable person under these circumstances being put in a room like that, seeing a polygraph machine, assuming he could see it, telling him you have a right to remain silent, all of the traditional Miranda Writes, the things that everybody knows from television and other aspects, that's what happens when you're in custody, when you're being detained by the police. And then things escalate from there. Well, if he hadn't been Mirandized, you'd be here with another argument, wouldn't you? Absolutely. Of course you would. Of course. And I'm not suggesting that their decision to Mirandize him was a misconduct on their part. No, but you're arguing coercive nature of this proceeding, and that includes the Miranda Warnings. Your Honor, I'm not arguing that this statement he made was involuntary. I'm not arguing that the confessions were beaten out of him or coerced out of him. But in terms of what a reasonable person would believe, not that they were coerced into talking, and not even coerced, but believing that they were not free to leave, which is the Fourth Amendment issue. We're not talking about a Fifth Amendment issue here under Brown and Dunaway and Kopp. The Miranda Warnings is one more piece of information that communicates that fact, that conclusion to an individual that I'm not free to leave. And then they confront him with the evidence. They confront him with the photograph. There really was no evidence to confront him with. And then they also, and it's not both of them at that point, it's just one agent, Lauer, you know, starts talking to him about his prior rape conviction, talks to him about – first talks to him about Vietnam and atrocities in Vietnam, knowing this man has post-traumatic stress disorder, then circles back and changes the Vietnam discussion to atrocities that Mr. Red Lightning may have committed, all before Mr. Red Lightning ultimately confesses. And a critical point for the analysis in determining whether a reasonable person would feel that they were not free to leave is the moment before he begins to confess. Because as we learn from Florida v. Royer and other cases where the facts are evolving, the court looks at all of the facts. And I think where the district court made a mistake in this case and where it erred in its analysis was it did not apply the subjective standard. It really just made two findings. It found that when he left the house, it was voluntary, and because the agents testify that he was free to leave, an uncommunicated fact, that therefore this whole thing was voluntary and there was no Fourth Amendment violation. Let me ask you a question along this line of your argument. At what point would you contend that, viewed objectively, a reasonable person would not have felt free to leave? Well, I think there are many points where that could happen. I think for the purposes of this case, it's right before the concession. What's the first point, assuming that he initially left his house voluntarily? I think the first point is when they pat him down. Because all of a sudden, the dynamic of this relationship has changed dramatically. Now you're not just a normal citizen. We're someone that we don't trust. You're like a suspect in a crime. That's even before he gets in the car, right? That's even before he gets in the car. But that's not necessary. The court doesn't have to go that far in this case to overturn the district court's decision. What's the point? If the pat down isn't enough, what's the next point at which you think a person is under arrest and can't leave? I think once you go into that interrogation room, you see a polygraph machine, the door gets closed behind you, and they start reading you your Miranda rights. I think at that point, all of a sudden, it becomes pretty clear why you're there. You're there because you are a suspect. If there's any doubt about that at that point, that doubt is quickly taken away when they tell him. Then how do you answer this question? The Miranda rights themselves say that he can stop everything, don't they? The Miranda rights do not tell you that you can get up and leave. The Miranda rights only tell you, number one, you have a right to a lawyer before questioning, and two, you have a right to remain silent. You can be quiet. But they don't say if you want, you can get up and get out of here. They do not say that. And we're not suggesting that in every case that additional warning should be given. That is an important factor in the cases. Florida v. Royer mentions it twice, the failure to advise the person that they're free to leave. Cobb v. Texas mentions it. There's other cases in our brief that mentions it. Those are in the Fourth Amendment context. In the Fifth Amendment context, there are numerous cases on the question of custody, which is somewhat, is not exactly the same, but analogous, where the courts, when the facts are close, have said that the reason we're upholding this is because the officer or the agent told the person they were not under arrest or they were free to leave. The Bassignani case comes to mind, which is far less egregious facts, and here they're questioning the person at his place of work in a conference room. The court referred to that as a close case for custody purposes. The determining factor was telling the person he was going to leave after the interview, and they, in fact, took him home. The Crawford case, the en banc case from the Ninth Circuit, is another case where it starts out, and it's somewhat of a confusing case because there's this parole search. It gets upheld as a parole search under the Fourth Amendment. They then take the person to the His Miranda rights were violated whether he was in custody, as I read the opinion, and again, the critical, in fact, I think they say the most important factor in that case was telling the defendant that he was free to leave or that he was not under arrest and could leave. Let me, if I could just clarify in my own thinking the significance of your custody argument. He was given Miranda warnings before he confessed. That's correct. So if he's in custody earlier than after his confession, is the significance just for the issues on your prompt presentment argument, or does it have other significance? Well, I think the Miranda warnings are significant to what a reasonable person would feel in With respect to the prompt presentment argument, the Rule 5 argument that we raised, the Miranda warnings, we have not argued that in our brief. We've essentially accepted, because that would back it up to 1117, I believe, our argument, we've accepted the district court's finding that the Rule 5 requirements for purposes of arrest began at 1222. I think an argument can be made that it was much earlier than that. And in fact, if the court were to find that Mr. Red Lightning was detained the moment he walked into that interview room, then the Rule 5 analysis should begin from that point, because Rule 5, I believe Rule 5 uses the word arrest, 3501 says arrest or other detention. If he's being detained at that point, even if it's without probable cause, the Rule 5 analysis should begin then. In fact, that would be fully consistent with the purposes of McNabb-Mallory and Rule 5, because one of the evils that McNabb-Mallory and Rule 5 were meant to address was government overreaching, bringing people in without probable cause and questioning them, or secret interrogations. And in fact, if we prevail on the Fourth Amendment, the court finds the detention is earlier than Rule 5. I mean, Rule 5 starts earlier as well. Okay, but does the, if you prevail that he was in custody earlier than when he confessed, then does that affect issues other than the presentment issue? Why is he entitled to relief if he was in custody when he was frisked and put in the police car? Or if he was in custody when he was put in the interrogation room, what's his entitlement to relief from that? Well, his entitlement to relief under Brown and Dunaway and Kopp is that that would be a Fourth Amendment violation, because there was no demonstration there was probable cause to arrest him. This is not the type of situation where a Terry analysis, a reasonable suspicion analysis, would allow you to do this. So it's a Wong-San just tree-poisonous-tree analysis. So it's an arrest without probable cause, and then the confessions are fruit of the poisonous tree kind of thing. Yes, unless the government can prove that the confessions were somehow attenuated by the unlawful arrest. And with respect to the first confession on October 2nd, it comes very quickly. And the speed of the confession on a Fourth Amendment analysis argues in favor of suppression. There's really no intervening circumstances other than Miranda warnings, which the court and Dunaway and Brown and Kopp have all said are not sufficient to attenuate the taint. We also believe that the government cannot meet their burden that the October 3rd statement should come in, that the taint from the illegal arrest is somehow attenuated simply by the overnight stay in the Whatcom County Jail, because there were no significant intervening events between October 2nd and October 3rd, which would allow for the admission of the he's interrogated again. Assuming we were to find an unlawful arrest at an earlier time, like when he's frisked or put in the interrogation room, is the record sufficient to analyze the taint issue as to the second-day confession? Well, Your Honor, I think it's an issue that ultimately could be reviewed de novo. I guess what the court is getting at is whether this case should be remanded for the question on the second day. If we agreed with you on your argument thus far, would we have to remand it, or could we make a decision on taint? Your Honor, I think that the facts are sufficiently well-developed through the evidence and the ruling. Alternatively, if the court felt it was not able to, it could remand on that second day. But the other way this case could resolve itself is if the court ruled in favor on the prompt-presentment issue on day two, that confession would be suppressed on an alternative ground, and then there wouldn't be a case left for the government here. I see that I've used up all my time on my first issue. This is on my nickel. Is it your position that if a person of interest confesses to a crime, the interview must cease and they must be arrested on the spot and taken immediately before a magistrate or a judge of some type? Our position is that the government or the law enforcement have this six-hour window, but that window does not change the Rule 5 presentment requirement. What Congress did was Congress essentially said, we're going to give you this six hours. And what happens in that six hours is there's no remedy for the violation. But once there's probable cause, and maybe not just at the point of probable cause, but at the point when the decision is made that the person is going to be taken into custody. Because you can have probable cause, and they could say, well, we're not going to arrest this person. We'll let him go home. Maybe they're investigating a postal theft case. But once they make that decision, once the two agents talk, maybe once they talk to the Assistant U.S. Attorney and say, this guy's going to get taken into custody. We have the evidence we need. At that point, no later than that point, I think that Rule 5 requirement kicks in. In this case, that would have been no later than 1.45 p.m. when they got the signed statement. They had already been in communication at that point, as I understand the testimony with an Assistant U.S. Attorney. So I think the right to prompt resentment began, if not at 12.22 or earlier, certainly no later than 1.45. And then the delays the rest of that afternoon are all attributed to the one reason that the courts, this court, Liera and Garcia-Hernandez and Corley, have said, are the one thing you can't do. You can't just keep the interrogation going as the reason for the delay. That's not a reasonable reason. Well, the arraignment was set for 2.30 in the afternoon, and he made it with time to spare, didn't he? Well, Your Honor, the arraignment is not a matter that was set. In Seattle, there is a calendar that typically starts at 10.30. But as we developed in the district court, sometimes those arraignments can last later. Sometimes they're scheduled later. There's three magistrate judges in this district. They're full time. They're in the courthouse. There's nothing carved in stone about this 2.30. I canvassed some other cities in this circuit. In some places they do it at 10 o'clock, 11 o'clock, 1.30. So I don't think your rights under Rule 5 should turn on when a court, where there's an available magistrate, happens to have their routine calendar scheduled. Our position is they could have gotten them there on the 2nd, and that's one of the violations. Counsel, I know I'm taking you over your time, but Judge Wardlaw is permitting my question there. I have one other issue I'd like you to address, and that is, assume that we ruled against you on the illegal arrest, said he was always free to leave, and that we ruled against you on whatever's left of McNabb, Nallery, on presentment, and you're left with your arguments about the trial. Could you rehearse with me your arguments? Go over your arguments as to why you think it was reversible error for the district court to exclude the expert's testimony about false confessions, when, as I understood the district court, he was just making a standard, foundational kind of ruling, not a Daubert ruling. It was saying, like, there's nothing in the record that would support this kind of testimony. First I think we have to look at, not only this trial, but any trial has three components. Evidence, jury instructions, argument. This case revolved solely around these confessions. Dr. Leo's... So the only evidence came from the defendant's mouth in this case? There was other evidence. There was the evidence of his prior rape conviction that involved a strangulation. There were these two or three civilian witnesses who testified to some suspicious activity right around the time of the murder. They were thoroughly impeached. The one woman had accused him of committing another murder where a dead body was found in a small town. Another woman said that he had sex on a casket in a graveyard. I mean, there was very bizarre testimony from these two or three witnesses. It's amazing the judge let that in and let some of Dr. Leo's testimony in. With respect to Dr. Leo, where I think the district court made its error, where it abused its discretion here, was that the phenomena of false confessions generally is really not well known among the public, number one. And that was one area he was going to testify to. Dr. Leo's role in the trial for us was to discuss the manner in which the agents and law enforcement conduct these interrogations and how the manner in which those interrogations can lead to a false interrogation. Now, we were at a severe disadvantage because the agents in this case intentionally chose not to video or audio record these interrogations. So we were having to prove, to some extent, by circumstantial evidence what happened here. I wanted to ask you about that because it seemed like, as I read the judge's ruling, he was thinking, rightly or wrongly, that there wasn't a foundation, that any improper coercive efforts were made. And I know that one of the officers had written a book saying you can use our manual, you can use these techniques. But still, the defendant hadn't – he's got a right to remain silent, but he hadn't recanted. He hadn't said that his confession was false, right? Is there any reported case that you can tell me about in any circuit that concludes a confession was false where the person who made the confession hasn't recanted and said, my confession was false? Because I was not aware of any. I know we had that duty case recently where a confession was false, but there, like, the defendant had changed his story and testified. So is there any case that you can tell me of where a federal court, district or appeals court, in a published case has found there was a false confession and let evidence of experts come in about the confession without some direct evidence like that? Well, Your Honor, there's not much case law on this topic to begin with. I'm not here to convince Judge Robart that the confession was false. We had a right under Crane v. Kentucky to make our case that this confession was false to the jury. As in any case, the prosecution can use circumstantial evidence, the defense can use circumstantial evidence. If this were a drug case and the defendant had written a book about how to do drug deals but he made no admissions, certainly that book and expert testimony about, you know, from the officers about how drug dealers work could have been used in conjunction and would have been admitted against the defendant. But the issue that I'm, the reason I'm asking my question relates to the foundation and the judge's concern about that. You know, could Dr. Leo testify in any case where someone had made a confession? Or is it just because here the officer had written a manual that Leo would challenge? Well, we put, in a criminal case, the defendant not only has a right to remain silent but every issue in the case in under Crane v. Kentucky, the truthfulness, the reliability, the credibility, the voluntariness of the confession are an issue. It's what the government has to prove, whether or not the defendant testifies. And I would respectfully suggest that with the circumstantial evidence that we presented, there was an adequate foundation for his testimony and that the district court erred by not allowing him to give that limited testimony. His testimony would not have been all that extensive. And he also erred with Dr. Breen in some ways, in a more serious way, on the other side of the ledger with Mr. Red Lightning's personal characteristics. We were not able to draw the connection between the vision problems, the PTSD, and the diabetes to what would have made him more susceptible to making a false confession. And that was a critical problem because the jury instructions did not tell the jury how to deal with this. They were very vague. And then in closing, the government took advantage of this by essentially arguing, particularly in the vision, that there was no connection made. So what? He's got this vision problem. What's the defense complaining about? There's no connection to what's going on here. And we couldn't make that connection because of the district court's ruling. Okay. Well, thanks. Thank you. You answered my questions about the trial. Great. Any other questions? Okay. Fine. Thank you, counsel. Good morning, Your Honors. My name is Michael Morgan. I represent the government on this appeal. I'd like to point the court to executive order. What's your best argument for excluding Dr. Leo's testimony? Dr. Leo's testimony? Well, Dr. Leo testified unequivocally that of the various factors that he believed could, in certain circumstances, possibly yield a false confession. He reviewed the suppression transcript. He also reviewed Agent Lauer's notes and testified that none of those objectionable techniques took place here. So that being the case, he had no relevant testimony to offer. Leaving aside whether or not, as an expert, his testimony as a false confession expert was sufficiently scientifically reliable to meet the first prong of a Daubert analysis, even assuming that, there's simply no basis for him to relate that expertise to the facts of this case. The district court never got to really the Daubert issues, as I understood it, because of his foundation ruling. I believe that is correct. The district court simply said in his written ruling that since Leo admitted that no objectionable techniques took place here, that there was no basis for him to offer any testimony. What do you mean objectionable? In my memory of this case is that, in fact, one of the police officers or agents had written about the technique of making a room sterile and having no stimulation and how that would bear on inducing a false confession. And there were facts in the record that I think your agents testified to that they purposely took one of their offices and removed all stimuli and put a poster over the window to create that very atmosphere. So how can you say there's no facts? Oh, your Honor, I would point you to excerpts of record 108 to 109, which is where Dr. Leo lays out the specific factors. And the consideration that your Honor has raised was not a factor that Dr. Leo said would yield a false confession. The factors were prolonged interrogation, denying of food, water, access to the bathroom, threats, promises of leniency, accusing the suspect of guilt, refusing to accept the suspect's denials, feeding information to the suspect, appeals to the suspect to clear his conscience, or lying to the suspect about the existence of incriminating evidence. Those interrogation techniques that Dr. Leo said were the ones that his research showed could prompt a false confession. There was nothing in Dr. Leo's testimony that the condition of the interrogation room, a nice, clean, to use the agent's word, sterile room, would somehow yield a false confession. So that's not a criteria that was relevant to Dr. Leo's proffer. And again, Dr. Leo admitted at the hearing that none of those enumerated objectionable techniques took place here. Where did he admit that? I would point, Your Honor, to excerpts of record, where did I put that? It's excerpts of record 1015 to 20. And there's additional citations in our brief, because there's also, he admits this also in cross-examination as well, but he's very clear that after reviewing the suppression transcript and after reviewing Agent Lauer's notes, that he could not identify any evidence that anything objectionable had occurred during this interrogation. That being so, there simply was no foundation for Leo to, there were no facts for him to have an expertise in this case. And that's why the district court providently refused to allow him to testify to that. Of course, a jury could disbelieve the agent, I suppose, and they didn't have a transcript of the confession. But could the jury both disbelieve the agent and then speculate he must have used an improper testimony, or an improper technique, rather? I think that the answer to the first question is obviously yes. The jury could have disbelieved the agent, but the answer to the second would be no. Because disbelieving the agent of his description of the events, that's not a license for them to just speculate about what may or may not have happened. I mean, a jury's verdict is supposed to be based on the evidence presented at trial. I mean, you can disbelieve the agent, but if there's no affirmative evidence showing that anything untoward took place, there's simply no basis for them. I want to ask you the same question I asked your opposing counsel. Is there any case in any federal appeals court or published district court where the court has permitted expert testimony about false confessions without evidence either that the defendant had recanted or some other kind of direct evidence that there was a false confession? I am unaware of any. I am aware of at least one where the Seventh Circuit has excluded testimony of a false confession for precisely the reason the district judge did here, namely that the expert could testify about techniques but could not say, based on the evidence that was presented at trial, that the defendant had recanted or some other kind of direct evidence. If you would agree with opposing counsel, I assume that they can prove any part of their case by circumstantial evidence. They can prove any part of their case by circumstantial evidence. However, again, I don't think that the fact that Agent Lauer wrote a manual that had one arguably objectionable technique in it that Leo pointed to, that that is somehow proof that Agent Lauer used that technique during the questioning. I would point out that especially at the suppression hearing, Lauer's testimony was unrebutted. There was nothing stopping Mr. Red Lightning from taking the stand and describing what There were two people in the room. Only the district judge had unrebutted testimony on that point. The testimony before the jury was unrebutted on that point. So, again, there simply was no factual basis for the jury to draw the inference that the defense wanted them to. Okay. Could you turn some attention to the issue that opposing counsel opened with, and that is whether under an objective standard, a reasonable person in Mr. Red Lightning's shoes would not have felt free to leave and therefore was in custody at some point before the confession? Yes, Your Honor. I believe that the line of cases that the defense has pointed to, Brown, Dunaway, and Kaup, they stand for an unremarkable proposition, that if you involuntarily take someone from their home on lacking in probable cause, well, that violates the Fourth Amendment. That's unobjectionable. But I would point the Court to footnote six in Dunaway in which the Court makes very clear that the trial judge had found as a factual matter that the defendant was involuntarily taken from his home. So the issue of consent was not an issue in Dunaway. That's just not the case here. The district judge very clearly found that Mr. Red Lightning voluntarily left his home. That finding is well supported by the record. First, when the agents approach, they're approaching him in the late morning. They identify themselves, but they're in plain clothes. They're armed, but their weapons are not drawn or displayed. They ask if they can come in. Mr. Red Lightning invites them in. They say they're investigating some cases and would he be willing to come down to the office and talk to them. That's it. Would I be willing to? Didn't say he had to. And Mr. Red Lightning said fine. And then what happens next, I think, is critical. For the next five to ten minutes, Mr. Red Lightning just wanders around his house. He's collecting things. He's, you know, getting ready to leave. And the agents ask him, well, do you, because they know that he is a diabetic, they say, well, do you need any medicine to come with you? Do you need to eat something before you leave? He says, no, no, I'm fine. I don't need to take... Because he assumed he wouldn't be there for the next two days, right? No, I think it's... I mean, he, when he voluntarily left the house, he thought he'd be back in a couple hours in time to get his insulin or his food or whatever he needed. Exactly, exactly. That's why that, right, when he left the house, but then that's the whole point of this whole discussion is that at some point, I mean, he couldn't just say, the agents didn't tell him he was... Okay, well, you've been here six hours. Now you want to go home and get your insulin? Well, no, that didn't happen in six hours. But by six hours hence, he was clearly in custody. That's not disputed. Right, right. But the point is that we're at... This is an escalating... It's a very, to me, very, very close because you have factors, legitimate factors and facts that point to each direction, whether there was arrest or not. I mean, lists of them, and it's a very close case. And, you know, it may come down to the agent should have said you're free to leave. It may come down to their knowledge that this was a diabetic and that at some point they should have said, well, you want to go home and get your medicine because you're not free to leave. And instead of just proceeding with the interrogation. Your Honor, I agree that it's an escalating thing. And I was beginning at the beginning because the defense has taken the position that he was arrested immediately. He didn't even take his glasses. I mean, he just said, okay, you're going to ask me about some cases. Okay, I'll go. I mean, so he went. And then, so then we start with the pat down, you know, and then there's another set of facts that layers into, okay, which way does that work on the factors? Well, that's correct, Your Honor. And I would point out that when he's patted down, it's a light pat down, but then critically, whatever, whatever coercive aspect that might have, is dissipated by the fact that he's placed in the car unhandcuffed. Now, wait a minute. If I'm really a suspect and I'm really being arrested, what agents are going to let me ride in their car unhandcuffed? So he's just riding in the back seat to- You want him to think he's not really being arrested. Excuse me? Well, I think if they didn't want him to think he was being arrested, then objectively he wouldn't think he's being arrested and therefore he wouldn't be in custody for Fourth Amendment purposes because it's an objective inquiry. So I think that that actually cuts in the government's favor that they don't handcuff him because they don't want to give any impression that he is in any way restrained in his liberty. And then when they take him to the office, again, he's placed in an interrogation room with one officer and he's questioned for, I think it's about an hour before the polygraph actually takes place, but most of that questioning doesn't even relate to this crime. So it's background questioning. It's questioning about his military service. It's questioning about his prior conviction. And it's important that during this questioning, Mr. Red Lightning, according to the testimony, is completely calm. He is in total control of his faculties. So again, there's nothing in the record to suggest that he felt any sort of coercion or restraint on his liberty. And then I think this is crucial. The questioning that leads to the polygraph is so innocuous. First of all, the defense has suggested that Mr. Red Lightning was told he's a suspect. That's just factually not correct. When they turn to the murder that was under investigation, they just said, were you involved or do you even know Rita DeSanche? Red Lightning says, no, I wasn't. They showed him a photograph simply to make sure that they know that they're talking about the right person. Do you recognize her? I don't recognize her. Would you be willing to take a polygraph? Sure. That's it. That is the sum total of the questioning. Now, how from that questioning, that context of that questioning, nothing about that suggests that he's been pinpointed as a subject and that he's not going anywhere. Presumably, he takes the polygraph and passes, he's going to walk out the door. So it's easy to see on this record why up to that point, the district judge found that Mr. Red Lightning was free to leave. He was free to terminate the encounter whenever he wanted. Then, you know, he takes the polygraph and he admits to the killing. It's debatable whether or not at that point he was, there was truly probable cause to arrest him or that he was even arrested at that point. But the district court found that, the government's willing to concede that, he did admit to a murder. So he's presumably arrested at that point. But admitting to a murder, I think, is probable cause. So there's no illegality up to there. So there's really no Fourth Amendment problem here, I would submit. And I think that the key case here is not Dunaway, but Mendenhall. Mendenhall makes clear that being asked to go to the police station and being placed in a room with an interrogating officer does not in and of itself rise to the level of an objective situation where a reasonably innocent person would think they're not free to leave. Mendenhall controls this case. With respect to the Rule 5 issue, I think that there's some factual findings that, again, are crucial. First, I think it's very clear that the agents were not required to immediately terminate their investigation when Mr. Red Lightning makes a one-word admission during the polygraph that he was involved in this murder. It was totally prudent police work for them to continue to question him about the crime, eliciting details that show that that one-word admission was, in fact, credible. And, of course, they did elicit details about the crime that only the killer could know. And that just took place over 20 minutes. And now you also have to remember that at the time they're questioning Mr. Red Lightning, they've got a stack of old open homicides. And they bore some factual similarities to the murder that he just confessed to. So they questioned him about those. He denied any involvement. He took a polygraph, and he denied any involvement in that. And now we're about to 1.30, and we have a written statement. He signs the statement. We're done at 1.45. 1.45, he's not getting down to the Seattle arraignment calendar, which was set at 2.30. Now, counsel suggested that somehow that 2.30 calendar isn't set in stone. Well, there's nothing in the record that suggests that he could have been arraigned any earlier. Counsel did submit an affidavit that suggested that, in his experience, occasionally there have been 4.30 arraignments. There's nothing in the record that suggests that Mr. Red Lightning could have been arraigned at 4.30 in this case. So the district judge providently found, as a factual matter, that as of 1.45, when the interview ended, he couldn't be transported to Seattle to be arraigned in time. So he found that the government was entitled to delay his arraignment until 2.30 at the next arraignment calendar. Well, that's a factual finding that the delay was due to the need to transport him and the time for transportation. That triggers the secondary safe harbor of Rule 5, which on its own would support the district court's finding that there had been no delay in his initial appearance. I would also point out that even if you were to examine the individual periods in and of themselves, every individual period was reasonable. The interrogation ends around 4.30. He's taken to his house between 5 and 6 to get his medicine and to call his son. So that period is perfectly reasonable. He's just getting his medicine. He's housed overnight from 6 to 8.30. Under this court's precedence, that delay is reasonable. And then we have the drive, the two and a half hour drive, two hour and 20 minutes, from Bellingham to Seattle. That too is reasonable. And the fact that they detoured to stop in Everett for 20 minutes is essentially immaterial. The reason being is that his initial appearance was scheduled. It was 2.30. He made it well before 2.30. He was at the courthouse. In every one of the cases that I've been able to find from this court, which it's held that there's been a violation of Rule 5, the defendant has been forced to miss a scheduled arraignment. That didn't happen here. Had the officers driven directly from Bellingham to Seattle and then interviewed him, you know, in the holding cell at the courthouse, there would be no problem. So the fact that they did so at the FBI office on the way is essentially a distinction without a difference here. Finally, with respect to, I just want to jump ahead to Dr. Breen's testimonies. We talked about that briefly. Maybe because we gave the appellant's lawyer so much extra time. Yes, of course. You can take what time you need. Well, another eight minutes would make it equal, if you need it. I don't think I'm going to need it. I just want to talk about Breen very briefly. Dr. Breen was not allowed to testify about whatever effects, if any, Mr. Red Lightning's post-traumatic stress or his vision or his diabetes might have had on his mental state for a very simple reason. Nowhere in Breen's proffer did he point to any scientific evidence or literature establishing a causal link between either PTSD, vision problems, or diabetes and one's cognitive functioning. And Breen was a neuropsychologist. He was being permitted to testify about Mr. Red Lightning's psychological functioning and his mental state at the time he gave his symptoms to any sort of impact on his mental state. Well, that's just testimonies beyond the scope of his expertise. And Breen was allowed to testify at length about how Mr. Red Lightning's post-traumatic stress and various other mental impairments, for lack of a better word, could have possibly impacted him during his interrogation. So Breen gave the testimony. Unless the court has any other questions, I'm prepared to wrestle my brief with the remainder of the arguments. I don't have anything else. Thank you, counsel. All right. The case of U.S. v. Red Lightning will be submitted and the court will adjourn this session for today. Thank you.
judges: Mills, Wardlaw, Gould